**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
KEITH KNIGHT,

                    Petitioner,

   - against -

WILLIAM PHILLIPS, Superintendent,

                  Respondent.

-------------------------------------------------------x
-------------------------------------------------------x
KEITH KNIGHT,

                    Petitioner,

   - against -

WILLIAM PHILLIPS, Superintendent,

                  Respondent.

-------------------------------------------------------x

**OPINION AND ORDER**

**05-CV-2758 (NG)**

**05-CV-2749 (NG)**

**GERSHON, United States District Judge:**

Petitioner Keith Knight, through counsel,[1] petitions this court for writs of habeas corpus under 28 U.S.C. § 2254, challenging his September 28, 1995 and December 7, 1995 convictions in New York State Supreme Court, Kings County.[2] At his first trial, petitioner was convicted by a jury of one count of first-degree burglary, one count of first degree robbery, and one count of second degree burglary. At his second trial, petitioner was convicted of one count of first degree burglary.

---

[1]    Knight initially filed his petitions *pro se*. However, after the court granted Andrea Hirsch, Esq.'s request to be appointed as counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, counsel represented petitioner and filed supplemental briefs on his behalf.

[2]    Petitioner was originally charged under one indictment, which included charges for three separate incidents. The state court ultimately severed the charges into three phases for purposes of trial.

Petitioner now contends that he is being held in custody in violation of the Constitution and laws of the United States.  For the reasons stated below, petitioner's applications are denied.

## BACKGROUND

### I.    The State Court Proceedings

Unless otherwise noted, the facts below either are taken from the state court record or are undisputed.

### A.    The Charges

The charges relevant to the instant petitions stem from separate incidents that occurred on April 9, 1994 and July 25, 1994, respectively.  With regard to the April 9 incident, the State charged that petitioner broke into a Brooklyn home, stole cash and property, and assaulted the owners of the home with a weapon while attempting to escape.  When police arrived at the scene of the robbery, they found a jacket that contained petitioner's wallet.  On May 31, petitioner was arrested after police obtained information as to his whereabouts.  At the time of his arrest, the police found stolen jewelry, from an unrelated incident, on petitioner's person.

With regard to the July 25 incident, the State charged that petitioner broke into another Brooklyn home, where he proceeded to steal certain personal property of the owner.  Upon finding petitioner in his home, the home's owner struggled with petitioner, and petitioner briefly absconded.  However, the home's owner, with two of his friends, pursued petitioner, apprehended him, and detained him until police arrived.

On the basis of the above events, petitioner was indicted by a grand jury on a twenty count indictment, charging four counts of Burglary in the First Degree, one count of Burglary in the Second Degree, two counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, four counts of Assault in the Second Degree, two counts of Criminal Possession

of a Weapon in the Fourth Degree, three counts of Criminal Possession of Stolen Property in the Fifth Degree, and two counts of Petit Larceny.  Prior to any pre-trial proceedings, petitioner successfully moved to have the charges severed, for purposes of trial, into three phases:  one phase for the April 9 incident, one phase for the July 25 incident, and one phase for the charges resulting from his possession of stolen property at the time of his May 1994 arrest.  Although the state court severed the charges for purposes of trial, the charges remained consolidated for the purposes of pre-trial proceedings such as the suppression hearings.

### B.    The Pre-Trial and Trial Proceedings

Prior to arraignment, the state court, pursuant to N.Y. County Law § 722, appointed Michael Horn, Esq., from the New York Legal Aid Society ("Legal Aid"), to represent petitioner.[3]  Horn represented petitioner through numerous pre-trial motions, including a motion, pursuant to N.Y. Crim. Proc. Law § 190.50, to dismiss the indictment for failure to afford petitioner an opportunity to testify in front of the grand jury.  In no fewer than three motions (including at least one pro se motion filed without Horn's consent), petitioner argued principally that the State enhanced the severity of the charges without giving petitioner adequate notice. Petitioner argued that had adequate notice been provided, he would have exercised his right to testify.  None of petitioner's motions were timely under the five-day limitations period specified in § 190.50.  Each of petitioner's motions to dismiss was denied by the state court.  Petitioner and Horn maintained a contentious attorney-client relationship, with petitioner frequently speaking at length in court, against Horn's advice, and filing pro se motions without Horn's consent.  *See, e.g.*, 12/2/94 Calendar Call Tr. at 4–13; 2/16/95 Calendar Call Tr. at 2; 2/22/95 Calendar Call Tr. at 5–15.  Largely because of Knight's perception that Horn failed to protect his

---

[3]      In addition to Horn, other Legal Aid attorneys represented petitioner at various proceedings, such as the identification lineup.

right to testify in front of the grand jury, Knight wrote a letter to the court asking that Horn be relieved.[4]

In March 1995, the court relieved Horn as Knight's attorney and appointed Peter Birkett, Esq., to represent petitioner.  Between Birkett's first appearance as Knight's attorney, in April 1995, and the beginning of the pre-trial suppression hearing in September 1995, Birkett requested several adjournments, purportedly as a result of other matters Birkett was actively trying.  Knight asserts that Birkett neglected his case because Birkett was giving a preference to his paying clients.  Nevertheless, Birkett did appear before the state court on several occasions, reviewed and adopted certain pro se motions petitioner wished to file, and obtained an investigator to look into the State's allegations.[5]  *See* 4/25/95 Calendar Call Tr. at 1–4; 6/1/95 Calendar Call Tr. at 2; 6/22/95 Calendar Call Tr. at 1.  At one point, after Knight complained about the number of adjournments, the court asked him if he wanted new counsel.  He did not respond.  5/25/95 Calendar Call Tr. at 4.

Birkett continued to represent petitioner through the commencement of the suppression hearing on September 7, 1995.   The suppression hearings included both *Wade* and *Mapp*/*Dunaway* hearings for all three trials.  *See United States v. Wade*, 388 U.S. 218 (1967); *Dunaway v. New York*, 442 U.S. 200 (1979); *Mapp v. Ohio*, 367 U.S. 643 (1961).  At the outset of the hearing, Birkett informed the court that he was not receiving full cooperation from petitioner and that petitioner was refusing to disclose the name of a certain witness who

---

[4]     Knight asserts that an additional reason for his firing Horn was that there was a political dispute between Legal Aid and Mayor Giuliani.  However, the precise reason for petitioner's request for a new attorney is not material to any issue in this case.

[5]     At the end of the June 1 calendar call, petitioner expressed his wish to represent himself, and the state court directed him to file a formal motion.  Petitioner apparently never filed the motion, and Birkett continued to appear on his behalf at subsequent court appearances.

4

petitioner thought might be useful to the case.  Tr. at 35.[6]  After petitioner informed the court that

he believed that Birkett had not met with him a sufficient number of times, the court instructed

petitioner that it believed Birkett to be a "top rate attorney[]" who was "bright on the law" and

who "fight[s] like hell for [his] clients."  Tr. at 38.

      During the hearing, Birkett questioned several witnesses at length, both on direct and

cross examination, made arguments to the court about the relevance of certain questions and

evidence, obtained relevant evidence the State had not yet turned over, and subpoenaed

additional witnesses.  *See, e.g.*, Tr. at 44–59, 129–132, 148, 152–64.  At one point during the

hearing, Knight complained that Birkett had not asked a witness any questions outside the scope

of the questions suggested by Knight.  The court responded that it would not have allowed

Birkett to ask any questions outside the scope of those he in fact asked and that the court had

actually allowed Birkett to ask questions that were "on the line" with regard to relevance.  Tr. at

86.

      After adjourning for the weekend, the suppression hearing was scheduled to resume on

Monday, September 11.  Birkett, however, was ill on that day.  After the hearing resumed the

following morning, Birkett informed the court that one of petitioner's witnesses, Robert

Newman, who was scheduled to testify the previous day, had become unavailable.  After

informing Birkett that it was not inclined to adjourn the hearing because the witness's

unavailability was due to Birkett's absence, the court requested a proffer as to what the witness

would testify.  After Birkett informed the court of the substance of Newman's expected

testimony, *i.e.*, testimony regarding the identification lineup that occurred in relation to the April

9 incident, the court found that the testimony was not substantially probative and therefore

---

[6]     "Tr." refers to hearing and trial transcripts.

denied the request to adjourn.  The court did inform petitioner, however, that if Newman became available and had relevant testimony, it would reopen the suppression hearing at any time, even after the trial had started.  (In fact, Newman became available later that same afternoon, and petitioner had a full opportunity to examine him.  *See* Tr. at 219–40.)

Upon being informed that the court would not adjourn the hearing to give petitioner a chance to examine Mr. Newman, petitioner informed Birkett that he wished to proceed *pro se*. Birkett relayed this to the court and stated that, "I believe he has an absolute constitutional right to do so."  The district attorney asked if it was "for the entire hearing."  Birkett responded, "I believe for the entire trial.  I don't think he's allowed to pick and choose."  Tr. at 183.  After Birkett's statement, the court responded as follows:

> Court:      Fine, you can sit next to him and advise him.  . . .  The defendant is articulate, he is respectful.
>
> Birkett:     He's also very intelligent.
>
> Court:      He demonstrated that he understands court procedures and the rules of the court.  He may not be as skilled as you are, but he does understand what's going on.
>
> . . .
>
> Court:      And I see no reason he can't represent himself.  Except at a hearing there are certain inherent problems in representing oneself when one is going to be the witness.
>
> Birkett:     Well, I think he's prepared to deal with those.  We discussed this on and off for some time.  I can only state up to this minute as his lawyer . . . I see no impediment of his proceeding pro se . . . .  I believe he's done it before.  . . .
>
> . . .
>
> Court:      I want to make sure of one thing, Mr. Knight, you understand the risks?
>
> Knight:     Yes, your Honor.

Court:       I will not in any way be emotional swayed [sic] by you representing yourself.  By you asking questions.  That's not going to affect me because I'm a judge.  During the course of trial, for the jury you'll never know how they act. There's a risk.

        During voir dire individual personal questioning of the jurors could lead to all sorts of complications and problems.  Many times attorneys ask me to ask certain questions and I'll give you an example.  You're black.  How old are you?

Knight:       I'm 38 years old.

Court:       You're a black male, 38 years old.  I don't know if that will affect a particular jury, your age, your race.  I don't know if race could come into this at all in any way.

        Many attorneys, if they feel it could be a possibility, prefer me to ask those questions in a way the jury doesn't feel it's coming from that table or that table.  My services are available to you as well.

        . . . Is [voir dire] good for you to do it or is it better for a lawyer to do it?  I can't answer the question.  You have to think it through.

        Personally, I think voir dire is better left in the hands of a lawyer because he is once removed from you.  You're not personally involved.  You're sitting there.  Are you following?

Knight:       I understand.

Court:       Suppose a juror—they're telling you about themselves and a little something comes up that should be discussed, a lawyer can go into it, he's a neutral person, you 're still the defendant and you're wearing two hats . . . .  And let's say a particular juror really shouldn't sit . . . me doing it, your attorney doing it is one thing, you doing it, I don't know if the question gets hot and heavy with respect to other jurors.

. . .

        [Y]ou have a stake in this case, you're the defendant, and you can get convicted and go to jail for a long time.  . . .  If you feel you can handle all of this yourself, fine, or if you feel that the insulation of a lawyer would be better, that's something that you should go through very carefully in your mind.  You're competent as far as I can see, at handling your own case.  I can't see any reason to legally deny you to represent yourself, but there are all these things to consider.

> They say that he who has himself for a lawyer has a fool for a client. That's not always true, but the point is the insulation factor isn't there. The jury can get mad at him for asking questions but not mad at you. That can get bored at his questions but not by you. . . . They can get turned off. You are sitting there, you're the person the People have to prove guilty beyond a reasonable doubt. . . . But once you assume both roles, you're dealing now with people and the risks of people. And you can become part of the interplay between yourself and the jury, not with me, because you've been very respectful . . . . I have no problem with you representing yourself, but I'm trying to point out the pitfalls. I can't help you if you put your foot in your mouth.

Tr. at 185–89. The court went on to admonish petitioner that, "There are legal issues you may not be aware of, and Mr. Birkett will assist you." Tr. at 190.

After the court so advised petitioner, petitioner advised the court that the decision to go *pro se* was "not an overnight decision" and that it was a decision he had been "contemplating since the opening of the case." Tr. at 192. He informed the court that he felt that Birkett was not "zealously into the case like he should [be]." Petitioner then listed the specific shortcomings he objected to. At that point, the court allowed petitioner to proceed *pro se*. Petitioner, frequently with Birkett's help, represented himself through the remainder of the suppression hearing. The final warning that the court gave petitioner, prior to trial, was to "make sure the questions you ask are not evidence." He gave as an example, "When *I* held you up, what were you wearing." Tr. at 292. Petitioner indicated that he understood.

Petitioner represented himself at trial, although Birkett was allowed to make objections and otherwise assist petitioner whenever petitioner so chose.[7] On September 28, 1995, the jury, after a short deliberation, found petitioner guilty of one count of first-degree burglary, one count

---

[7]   Birkett also assisted Knight during voir dire and at the hearing pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), which held that "a Trial Judge may . . . make an advance ruling as to the use by the prosecutor of prior convictions or proof of the prior commission of specific criminal, vicious or immoral acts for the purpose of impeaching a defendant's credibility." *See, e.g.*, Tr. at 322–30; 473.

of first degree robbery, and one count of second degree burglary.  On October 31, 1995, defendant was sentenced to twenty-five years to life imprisonment.

After petitioner's sentencing, the State proceeded to the second of petitioner's trials.  The first calendar call for petitioner's second trial occurred on Thursday, November 30, 1995.[8]  At the beginning of the conference, at which Birkett was present, the court asked petitioner if Birkett was his counsel.  Knight responded, "I was going *pro se* by Judge Pincus, and I would like to maintain that right until further notice, your Honor."  Tr. at 2.[9]  Knight went on to say that proceeding *pro se* was his "wish right now until further notice," but stated that he did "have the right to change [his] mind."  *Id*.  At that point, Birkett proceeded to provide the court with the status of the case.  He informed that court that

> Mr. Knight and I have not spoken since he was sentenced.  There have been a series of problems in terms of our getting together since he was sentenced on the other trial. . . .  He has advised me as standby counsel that there are certain things he wishes the investigator to do regarding this second case. . . .  The investigator . . . is available to do whatever has to be done over the weekend. . . .  In addition, we have not had an opportunity . . . to discuss this case in terms of actually having it ready for trial.

Tr. at 3.  Birkett went on to request that the court adjourn jury selection (which was to start that afternoon) until the following week.  Knight then informed that court that he had "not even heard the 911 tape" and that there were "a lot of things I don't know about this case . . . ."  Tr. at 4.  Knight therefore told the court he was not ready to proceed.

The State objected to delaying the trial, arguing that the case was "well over a year and a half old" and that part of the delay was based on duplicative and frivolous *pro se* motions filed by Knight.  The State pointed out that the 911 tapes, and nearly all other discovery,[10] were turned

---

[8]      Petitioner's second trial was held before a different trial judge.

[9]      The trial record pagination starts over at the second trial.

[10]     The only exception to this was certain *Rosario* material applicable only to the second

over to petitioner prior to the first trial.  The State asserted that it had informed petitioner prior to the first trial that the second trial would commence immediately.  Tr. at 6–7.  In response, petitioner stated that, although he had already received most of the materials, and that his investigator had already performed work for the second trial, he would like an adjournment until "some day next week."  Tr. at 8.  He asserted that he had not yet listened to the 911 tapes for the second trial and that there were a few more things the investigator needed to do.  In response, the court stated that Knight would be afforded the opportunity to listen to the tapes that same day, but that the proceedings were going to continue.  Tr. at 9.

Birkett then reiterated that he had not had a chance to discuss the case with Knight and asked that the court delay jury selection until Monday morning.  The court responded that Birkett was not Knight's attorney and that the proceedings would continue.  Tr. at 10.[11]  After a brief recess in which Knight was allowed to speak to the investigator, the court resumed and began to discuss with Knight his decision to go *pro se*.

The court provided Knight with thorough warnings regarding self-representation.  After inquiring about his educational and criminal history, the court inquired as to why Knight wished to proceed *pro se*.  Knight responded that it was due to a "lack of communication between myself and Mr. Birkett."  He further stated that he believed Birkett was not sufficiently prepared, and therefore that petitioner "could have done the same or better for [himself]."  Tr. at 16.  The court then proceeded to warn petitioner, in detail, about the dangers of going *pro se*, including a laymen's lack of legal knowledge; the high conviction rate for defendants who represent

---

case.  *See People v. Rosario*, 9 N.Y.2d 286 (1961).  Under New York law such material does not have to be turned over until immediately prior to the prosecution's opening statements.  *See* N.Y. Crim. Proc. Law § 240.45.

[11]     In fact, as discussed further below, jury selection did *not* begin until the following Monday.

themselves; that once he decided to go *pro se*, petitioner was no longer entitled to legal advice; and that he would be subject to the same rules of evidence and procedure as an attorney.  Tr. at 17–24.  In response, Knight informed the court that he believed it was the court's and the district attorney's job to protect his rights.  The court responded that, while no one would intentionally violate his rights, in proceeding *pro se*, petitioner would be without a trained lawyer to protect his rights.  The court then stated that it believed Knight was putting himself in a "very perilous situation," and strongly advised him against going *pro se*.

In response to these warnings, Knight informed the court that, "if I had enough faith in what was going on between myself and counsel, I wouldn't take the route of representing myself."  Tr. at 27–28.  Knight informed the court that he never believed Birkett was ready and that he and Birkett had not prepared for the second trial.  The court then asked one more time if Knight wished to proceed *pro se*.  Knight responded that he did "unless you intend to give me another attorney."  The court responded that it would not provide Knight with another attorney because the parties were ready for trial.  Tr. at 29, 34.  The court did, however, allow Birkett to assist Knight throughout the proceedings, in a manner similar to what he did at the first trial. The court allowed Birkett to argue the *Sandoval* hearing, at which he successfully convinced the court to exclude evidence of one of Knight's prior convictions, and to conduct voir dire.[12]  Tr. at 40, 54.

Because Knight is an observant Muslim, the court adjourned the case until Monday.

---

[12]    Nearly eight years after petitioner's convictions, Birkett was disbarred.  Petitioner argues that Birkett was disbarred for client neglect and abandonment.  In fact, Birkett was disbarred after he failed to respond to a petition, authorized by the Appellate Division, alleging neglect, client abandonment, *and* failure to refund client fees.  Because Birkett failed to respond to the charges, they were deemed admitted, and he was therefore disbarred.  *See In the Matter of Peter W. Birkett*, 305 A.D. 1 (2d Dep't 2003).  In any event, Birkett's disbarment, for unrelated cases and nearly eight years after petitioner's convictions, has no bearing on the instant petition.

Therefore, although the court formally denied petitioner's and Birkett's request to adjourn jury selection until the following week, the practical combined effect of the *Sandoval* hearing and petitioner's religious observation was that jury selection did not being until the following Monday, December 4, 1995.  Jury selection lasted the entire day on December 4.  During jury selection, Knight objected under *Batson v. Kentucky*, 476 U.S. 79 (1984), to the State's use of peremptory challenges, after the district attorney had used five of six challenges to remove African-Americans.  Although the court found that Knight carried his initial burden of showing a *Batson* violation, the district attorney offered non-pretextual reasons for the challenges, which the court accepted.  Knight's *Batson* challenge was thus denied.

The trial began on Tuesday, December 5.  The evidentiary portion of the trial lasted two days.  On December 7, 1995, the jury found petitioner guilty of one count of first degree burglary.  The court imposed a sentence of twenty-five years to life, to run consecutive to his previous sentence.

### C.    Petitioner's Appeal

For purposes of his appeal, the court assigned Donna Delahanty Walsh, Esq. to represent petitioner.  In preparation for his appeal, Knight wrote several letters to Walsh, discussing aspects of the case, asking her to obtain materials that he wanted to review, and identifying twenty-one issues that Knight felt merited relief.  According to petitioner, Walsh largely ignored his correspondence and did not discuss the case with him as frequently as he felt appropriate.  At one point, Knight enlisted the help of a friend, who was also an attorney, to spur greater communication with Walsh.  According to Knight, this had no effect.  On the contrary, in an affidavit filed by Walsh in connection with the instant petition, Walsh states that she contacted Knight to discuss her strategy, which was to identify only the "very strongest arguments" to

12

present to the Appellate Division.  She also states that she "attempted to consult with Mr. Knight earlier in a letter by requesting that he discuss what he thought were the three strongest arguments."  *See* Walsh Aff. ¶ 8.  Moreover, with regard to the correspondence that petitioner has provided in connection with this petition, Walsh stated that "other key correspondence I mailed to Mr. Knight is not included."  Walsh asserts that she corresponded with Knight about her "approach in the brief [and] his right to file a supplemental brief" and that she "sent to Knight the Respondent's brief."  *Id.* at ¶ 9.

In April 2000, Walsh told Knight that it was "extremely important that we focus on the critical constitutional issues" and asked him to identify the "three most compelling" arguments that he believed were meritorious.  *See* Pet'r's Supplemental Mem. of Law (05-CV-2758) at 19. Unhappy with this response, and believing that Walsh was relying on him to determine which issues to pursue, Knight asked the Appellate Division to relieve Walsh.   His request was denied.[13]

In April 2001, Walsh filed a single, thirty-page brief attacking both convictions.   The brief raised three points:   (1) that Knight's consecutive twenty-five to life sentences were excessive and should be reduced under the court's interest-of-justice jurisdiction; (2) that the State committed a *Batson* violation in using its peremptory challenges;[14] and (3) that the indictment should be dismissed because, in failing to inform Knight that it would be seeking more serious charges in front of the grand jury, the State violated his statutory right to testify. Walsh did not file a reply brief and did not request oral argument.

---

[13]     Knight identified several other communications sent to Walsh, to which he alleges she did not respond.  However, because her alleged failure to respond to Knight has no bearing on the court's decision on this issue, a detailed recount of Knight's allegations is unnecessary.

[14]     Although, as petitioner points out, Walsh did not specify for which trial she was making the *Batson* claim, only the second trial had any *Batson* issues.

On May 28, 2001, petitioner, dissatisfied with Walsh's brief, moved to have it withdrawn from consideration.  In response, Walsh filed an affirmation with the Appellate Division, stating that she had raised every issue she felt meritorious.  The State opposed petitioner's request.  On July 18, 2001, the Appellate Division denied Knight's request, but granted him leave to file a supplemental brief.  Thereafter, Knight filed a supplemental brief, raising five issues, including: (1) that he was denied his statutory right to a speedy trial; (2) that Horn was ineffective in the first trial for failing to preserve his statutory right to a speedy trial and to testify in front of the grand jury; (3) that Birkett was ineffective in the first trial for failing to prepare for the trial, failing to preserve his statutory right to a speedy trial, and failing to advise him of the dangers of going *pro se*; (4) that the court violated his constitutional rights by failing to properly advise him of the dangers of going *pro se* and by precluding him from introducing certain impeachment evidence; and (5) that the court violated his constitutional rights in the second trial by forcing him to choose between unprepared counsel and going *pro se* and by undermining his right to present a defense.[15]

On November 3, 2003, the Appellate Division rejected petitioner's appeal.  After discussing the grand jury and excessive sentencing issues, the court specifically noted that, "The defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit."  *People v. Knight*, 1 A.D.3d 379, 380 (2d Dep't 2003).  On February 5, 2004, the Court of Appeals denied Knight's request for leave to appeal.  *People v. Knight*, 1 N.Y.3d 630 (2004).

---

[15]     Subsequent to filing his brief, Knight attempted to alert the Appellate Division that Birkett had been disbarred.  The court, however, refused to accept an "application" from a represented defendant.

### D.     Petitioner's N.Y. Crim. Proc. Law § 440.10 Motion

On May 17, 2005, Knight filed a post-conviction motion alleging that both Horn and Birkett provided ineffective assistance of counsel by failing to advise him adequately regarding the State's pre-trial plea offers.  Prior to his first trial, the State had offered a plea of ten years to life, and subsequently eight years to life, which would cover the entire indictment.  At the time, Knight had seven years of parole remaining from a previous conviction.  According to Knight, he labored under the mistaken belief that the seven remaining years of parole would be added as an imprisonment term to the minimum portion of the sentence, as opposed to the maximum.  Knight asserts that he conveyed this mistaken belief to both Horn and Birkett and that neither attorney corrected him.  In support of his motion, Knight submitted an affidavit stating that, if he had correctly understood the effect of his parole, "there was a very strong probability that defendant could have been persuaded to accepted [sic] the offer the same way the Legal Aid attorney was able to convince him not to testify at the grand jury after arguing with the defendant for at least 15 minutes."

In response to Knight's motion, the State submitted an affidavit from Horn.  In it, Horn stated that he

> advised Knight to accept the People's plea offer of 10 years-to-life.  I also advised Mr. Knight that the seven years he would owe for violating parole pursuant to this guilty plea in this case would be tacked on to the maximum aspect of his ten years to life sentence and not on to the minimum aspect of his sentence, and that his sentence would effectively be ten years to life.  . . .  Prior to trial I also discussed the plea offer in this case with multiple attorneys . . . who in turn also discussed the plea offer with Mr. Knight and advised him to accept the offer.

Horn Aff. ¶ 4.  Horn went on to assert that he "often had occasion to advise clients about how time owed on a parole violation would affect their sentences" and that he was therefore "well aware . . . that the time owed on a parole violation is tacked onto the maximum aspect of an

15

indeterminate sentence . . . ." *Id.* ¶ 5.  Horn concluded that, because he discussed Knight's plea offer with multiple attorneys at Legal Aid who in turn advised Knight regarding the plea, he was "confident Mr. Knight was correctly advised about how the parole violation would affect his sentence." *Id.*

In denying Knight's motion, the court first stated that it found "on its face that the affidavit from [Horn] is credible and may very well lead to a finding that defendant's claims are without merit.  [T]he likelihood of successive counsel failing in an identical manner to advise defendant about the same routine matter is extremely low." *People v. Knight*, 831 N.Y.S.2d 349, 350 n.2 (N.Y. Sup. Ct. 2006).  The court went on, however, to hold that, even assuming the veracity of Knight's allegations, his affidavit did not "establish[] that there is a reasonable probability that, but for counsels' deficiencies, he would have insisted on pleading guilty." *Id.* The court found that Knight's affidavit lacked the "evidentiary detail and resolve" that would justify a finding of prejudice.  The court found that the affidavit demonstrated a "less committed, more equivocal attitude far removed from a resolute intention to plead guilty." *Id.*   In conclusion, the court, in denying Knight an evidentiary hearing on the issue, found that the fact that Knight, "if fully aware of the consequences of his plea, might have been willing to entertain accepting a plea if counsel applied enough pressure is not a sufficiently strong commitment to warrant a hearing."[16]  The Appellate Division denied leave to appeal.

---

[16]     An alternative ground on which the court denied Knight's motion was that "the mere failure of counsel to advise defendant of the potential collateral consequences of a guilty plea, without more, does not constitute ineffective assistance of counsel."  However, the Supreme Court has recently rejected the "collateral consequences" doctrine.  *See generally Padilla v. Kentucky*, 130 S. Ct. 1473 (2010).

E.    *Coram Nobis* **Proceedings**

On September 27, 2006, petitioner filed a *coram nobis* petition in state court, asserting that his appellate counsel, Walsh, provided ineffective assistance of counsel.  Petitioner argued that Walsh failed to communicate adequately with him, failed to research the issues, failed to raise substantial issues on appeal, failed to request oral argument, failed to notify him of the Appellate Division's decision affirming his appeal, and failed to timely file an application for leave to appeal.  The Appellate Division denied petitioner's motion, stating only that "appellant has failed to establish that he was denied the effective assistance of appellate counsel." *People v. Knight*, 37 A.D.3d 738 (2d Dep't 2007).  The Court of Appeals denied leave to appeal.  *People v Knight*, 9 N.Y.3d 846 (2007).

F.    **Knight's Federal Habeas Corpus Petitions**

On June 8, 2005, Knight filed two petitions for a writ of habeas corpus in this court—one each for his first two trials.  As discussed above, Knight initially represented himself in these petitions.  In his *pro se* petition relating to his first trial, petitioner claimed that:  (1) he was denied effective assistance of counsel when Horn failed to advise him of the enhanced charges against him, thereby failing to protect his statutory right to testify in front of the grand jury, and when Horn failed to protect his statutory speedy trial rights; (2) he was denied effective assistance of counsel when Birkett failed to prepare for trial and failed to advise him of the dangers of proceeding *pro se*; (3) he was denied his Sixth Amendment right to counsel when the trial court failed to advise him adequately of the dangers of going *pro se*; (4) he was denied the right to admit impeachment evidence; and (5) he was denied effective assistance of appellate counsel.

In his *pro se* petition relating to his second trial, Knight claimed that he was denied his Sixth Amendment right to counsel when the court forced him to either proceed to trial with unprepared counsel or proceed *pro se*.

After counsel for Knight was appointed, this court permitted the filing of supplemental briefing. In the supplemental briefing, Knight's counsel provides greater content to certain of Knight's *pro se* arguments, but declines to press others. In addition, Knight's counsel asks that this court allow petitioner to amend the original petitions to include his plea-related ineffective assistance of counsel claims, which had not been exhausted at the time his petitions were originally filed. As discussed further below, that request is granted.

## DISCUSSION

### I.     Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), where the challenged state court decision was adjudicated on the merits, the writ may not issue unless the state court proceeding: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in  a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).

For a federal law to qualify as "clearly established" for the purposes of federal habeas review, it must be embodied in the "holdings, as opposed to the dicta," of Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 399, 412 (2000). And, for a state court decision to be "contrary to," or an "unreasonable application of," that Supreme Court precedent, the decision must: (1) arrive at a conclusion opposite to that reached by the Supreme Court, on a question of

law; (2) decide a case differently from the Supreme Court on a set of materially indistinguishable facts; or (3) identify the correct governing legal principle but unreasonably apply that principle to the facts of the prisoner's case. *Portalatin v. Graham*, 624 F.3d 69, 78 (2d Cir. 2010).  To satisfy this standard, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011).[17]  State court factual findings are "presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## II.   Petitioner's Habeas Corpus Claims

Petitioner's claims based on state statutory rights or state evidentiary rulings are pressed only by Knight in his *pro se* brief.  The remaining claims are asserted by both Knight and his counsel in the supplemental briefing.

### A.   Knight's *Pro Se* Claims Based on State Statutory Rights and Evidentiary Rulings

Knight first argues that Horn was ineffective for failing to protect his New York statutory right to testify in front of the grand jury, and also that both Horn and Birkett were ineffective for failing to protect his New York statutory right to a speedy trial.

To succeed on a claim of ineffective assistance of counsel, a defendant must show not only that counsel's performance was deficient but also that the deficiency prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To demonstrate prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of

---

[17]    The Supreme Court has characterized this standard as "difficult to meet" and "highly deferential."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

the proceeding would have been different."  *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

Unless Petitioner shows both these elements, it cannot be said that his conviction resulted from a

breakdown in the adversary process that rendered the result of the proceeding unreliable in

violation of the Sixth Amendment. *Strickland*, 466 U.S. at 687.   Judicial review of counsel's

performance is "highly deferential," and courts "must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  *Id.* at

689; *see also Premo v. Moore*, 131 S. Ct. 733, 740 (2012) ("The standards created by Strickland

and 28 U.S.C.S. § 2254(d) are both highly deferential, and when the two apply in tandem, review

is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is

substantial.").

    In the case of petitioner's statutory-based ineffective-assistance claims, therefore,

petitioner must show, not only that Horn and Birkett failed to make appropriate motions to

protect these rights, but also that the failure harmed petitioner.  With regard to petitioner's grand

jury claim, the Appellate Division expressly rejected on the merits the claim that he was denied

his statutory right to testify in front of the grand jury.   Therefore petitioner cannot demonstrate

prejudice.

    With regard to petitioner's speedy trial rights, although the Appellate Division did not

specifically mention such rights, it did rule that petitioner's remaining claims, including the

claims made in his *pro se* supplemental brief (which asserted a direct speedy trial claim as well

as an ineffective assistance of counsel claim based on a failure to protect speedy trial rights),

were *without merit*.  Moreover, "when a defendant presents a claim of denial of a fundamental

right to the Appellate Division, and the Appellate Division affirms without opinion, a federal

court should presume that the Appellate Division considered the constitutional claim and decided

it on the merits, and did not base its summary affirmance on procedural default." *Parron v. Quick*, 869 F.2d 87, 90 (2d Cir. 1989); *see also Hawthorne v. Schneiderman*, 2012 U.S. App. LEXIS 17505, at *8–9 (2d Cir. Aug. 20, 2012) ("AEDPA unquestionably requires deference to a state court's summary disposition of an appeal.") (citations and quotations omitted).  If the Appellate Division rejected the merits of petitioner's speedy-trial based ineffective-assistance claim, it necessarily must have determined that petitioner's underlying state speedy trial claim was without merit.  If petitioner had had a meritorious speedy trial claim, requiring dismissal of the indictment, and petitioner's attorney failed to assert it, petitioner would be able to demonstrate both deficient performance and prejudice.  *See Parron*, 869 F.2d at 90 (holding that, in ruling on the merits of a speedy-trial based ineffective assistance claim, "it follows that the Appellate Division would have had to consider the substance of the underlying speedy trial motion and find it without merit").[18]  Petitioner's ineffective assistance claims, based on a failure to protect state statutory rights, are therefore rejected.

Petitioner also challenges several of the trial court's evidentiary rulings, as well as the alleged denial of daily transcripts.  In general, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review. *See Hawkins v. Costello,* 460 F.3d 238, 244 (2d Cir. 2006) (citing *Crane v. Kentucky,* 476 U.S. 683, 689 (1986)).  The only exception to this rule, other than where there is a direct violation of an express constitutional provision, is if the challenged evidentiary rulings violate due process, in that they affect the fundamental fairness of the state court proceedings.  *See DiGuglielmo v. Smith,* 366 F.3d 130, 137 (2d Cir. 2004). This requires a showing that the

---

[18]     In addition, to the extent that Knight's claim can be read to allege ineffective assistance based on counsel's requests for adjournment, he has failed to demonstrate that such requests were without "tactical justification," *see Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir. 2006), or, more aptly, that the Appellate Division was unreasonable in rejecting this claim.

erroneous evidentiary ruling would have changed the outcome of the proceedings. *See Collins v. Scully,* 755 F.2d 16, 19 (2d Cir. 1985).

None of the rulings petitioner complains of affected the fundamental fairness of the state court proceedings.   In addition, there is no constitutional right to the daily provision of transcripts to indigent defendants. *See United States v. Sliker*, 751 F.2d 477 (2d Cir. 1984).

For the reasons stated above, petitioner's claims based on ineffective assistance of counsel for failure to protect state statutory rights, certain trial court evidentiary rulings, and the alleged failure of the trial court to provide daily transcripts are denied.

**B.    Petitioner's Claim that Birkett Provided Ineffective Assistance of Counsel in the First Trial**

Petitioner claims that, prior to his determination to proceed *pro se*, he received ineffective assistance of counsel from Birkett because Birkett suffered from a conflict of interest between the time he spent on the cases of paying clients and the time he spent on petitioner's case, which paid a lower, court-approved rate.[19]   Petitioner further claims that the presence of this conflict merits *per se* reversal of all of his convictions.   Petitioner misapprehends the type of conflict of interest that gives rise to automatic reversal.

A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel. *See Wood v. Georgia*, 450 U.S. 261, 271 (1981). Under *Strickland*, if a defendant establishes that her attorney had a *potential* conflict of interest, she must nevertheless demonstrate prejudice.   However, prejudice is presumed when a defendant

---

[19]    The State contends that this claim was not properly presented in the Appellate Division, and is therefore unexhausted.   Petitioner contends that the allegations in his *pro se* supplemental brief were sufficient.   Because I find the claim to be without merit, however, I need not reach the issue of exhaustion. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

establishes that her attorney had an *actual* conflict of interest that adversely affected the attorney's performance in any way. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests "diverge with respect to a material factual or legal issue or to a course of action." *Cuyler*, 446 U.S. at 356 n.3.  According to the Second Circuit, the Supreme Court has "made clear . . . that the presumption was created to account for the 'high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice.'"  *Torres v. Donnelly*, 554 F.3d 322, 325 (2d Cir. 2009) (quoting *Mickens*, 535 U.S. at 174).  Here, petitioner has presented no actual conflict that would merit the presumption of prejudice.

Petitioner has not alleged that any of Birkett's paying clients had factual or legal interests in conflict with Knight's.  Nor has petitioner identified a course of action that Birkett did not pursue because of a divergent, superior interest.  At most, petitioner alleges that Birkett favored, and perhaps spent more time with, his paying clients.  This allegation is insufficient to trigger automatic reversal.  *See Mickens*, 535 U.S. at 171 (stating that an actual conflict of interest does not include a "mere theoretical division of loyalties"); *United States v. Schwartz*, 283 F.3d 76, 91 (2d Cir. 2002) ("To prove a lapse in representation, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.").

Because petitioner has not established an actual conflict of interest, Birkett's pre-trial representation is measured under the traditional *Strickland* standard. In arguing that the Appellate Division unreasonably denied his ineffective assistance claim, petitioner asserts that

"even if judged by an ineffectiveness standard . . . [Birkett] was deficient and Knight suffered prejudice in proceeding *pro se* at least in part [due] to Birkett's urging and misstatements of law and the court's acceptance of his remarks."  Because, as discussed further below, the trial court in the first trial adequately informed petitioner of his Sixth Amendment rights, and because there is no evidence to suggest that Knight relied on the alleged misstatement regarding not being allowed to "pick and choose" between proceeding *pro se* or with counsel, this claim is likewise without merit.[20]

For the reasons stated above, petitioner's conflict of interest claim is without merit, and the Appellate Division did not act unreasonably in denying petitioner's ineffective assistance of counsel claim as it pertained to Birkett's pre-trial representation.

### B.    Petitioner's Claim That He Was Provided Inadequate *Pro Se* Warnings in the First Trial

Petitioner argues that his Sixth Amendment right to counsel was violated when the trial court failed to ensure adequately that petitioner's waiver of the right to counsel was knowing and voluntary.  In support of this argument, petitioner asserts that the court's warning was inadequate; that the court and Birkett inappropriately suggested to Knight that he was capable of representing himself; that Birkett misled Knight by saying he couldn't "pick and choose" between proceeding *pro se* and having counsel represent him; and that, in light of Birkett's unpreparedness for trial, Knight's choice to proceed *pro se* was involuntary.

---

[20]    Knight's petitions also can be construed to claim that Birkett was ineffective simply because he did not confer with Knight sufficiently prior to the suppression hearings in the first case.  Even assuming this to be true, "brevity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance of counsel."  *See Raposo v. United States*, 2004 U.S. Dist. LEXIS 8081, at *12 (S.D.N.Y. May 7, 2004) (quoting *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984)).  As discussed above, Knight has pointed to no alternative defense or strategy that would have been pursued had Birkett and Knight consulted for additional time.  Therefore this claim must likewise fail.

24

### 1.     The court's *pro se* inquiry

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process."  *Iowa v. Tovar*, 541 U.S. 77, 87 (2004) (quoting *Maine v. Moulton*, 474 U.S. 159, 170 (1985)).  Furthermore, the Sixth Amendment "right to assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help."  *Faretta v. California*, 422 U.S. 806, 814 (1975) (citations and quotations omitted).  However, prior to permitting a criminal defendant to proceed *pro se*, clearly established Supreme Court precedent requires that a court determine that the waiver of counsel is "knowing, voluntary, and intelligent."  *Tovar*, 541 U.S. at 88 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  The determination of whether there has been an intelligent waiver of rights depends on "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused," *Zerbst*, 304 U.S. at 464, and the "complex or easily grasped nature of the charges."  *Tovar*, 541 U.S. at 88 (citing *Zerbst*, 304 U.S. at 464).  Courts must indulge "every reasonable presumption against waiver of fundamental constitutional rights."  *Zerbst*, 304 U.S. at 464.  Nevertheless, the Supreme Court has never "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88.

In support of his assertion that the trial court's *pro se* warnings were inadequate, petitioner points to a cascade of specific warnings and inquiries that circuit courts require of, or suggest to, the federal district courts in their circuits.  Warnings required by the various circuit courts, however, and indeed even within the Second Circuit itself, are immaterial to determining whether the Appellate Division unreasonably applied clearly established Supreme Court precedent when it denied petitioner's Sixth Amendment claim.  *See Parker v. Matthews*, 183 L.

Ed. 2d 32, 41 (2012) (finding that the Sixth Circuit erred in considering its own precedent when analyzing a claim of prosecutorial misconduct, and expressly stating that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1)). Moreover, although petitioner may be correct that, in certain circumstances, circuit precedent can shed light on what is clearly established Supreme Court precedent, circuit precedent provides no guidance when that precedent amounts to an elaborate or detailed application gleaned from a generalized Supreme Court standard, as in this case. *See id.*; *Swiger v. Brown*, 86 Fed. Appx. 877, 880–81 (6th Cir. 2004) (stating that Circuit precedent requiring specific *pro se* warnings has no application in determining clearly established Supreme Court precedent for purposes of AEDPA); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations."). Therefore, this court's obligation is to identify clearly established Supreme Court precedent, and determine whether the Appellate Division's application of that precedent was unreasonable "beyond any possibility of fair-minded disagreement." *Dixon*, 132 S. Ct. at 27.

In arguing that the trial court failed to advise him adequately of the pitfalls of proceeding *pro se*, petitioner argues that clearly established Supreme Court precedent requires a court to make a defendant "aware of the dangers and disadvantages of self-representation . . . ." *Faretta*, 422 U.S. at 834. But this language, taken from *Faretta*, is dictum. In *Faretta*, the question presented to the Court was "whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." *Faretta*, 422 U.S. at 807. The Court answered this question in the negative. That the Court went on to find that Faretta did in fact knowingly and voluntarily waive his rights, citing

26

trial court warnings in support of this finding, does not render such a finding necessary to the Court's answer to the question presented. *See Dallio v. Spitzer*, 343 F.3d 553, 562 n.3 (2d Cir. 2003) (panel majority "not convinced" by the concurrence's belief that "the Supreme Court would not have vacated the state judgment of conviction if it had not been satisfied that Faretta knowingly exercised his right to self-representation"). Moreover, even if a finding of waiver were necessary to the holding, it does not follow that every factor that the Court identified in analyzing the waiver issue was thereby transformed into a mandate for all future courts. *See id.* ("[W]e do not understand every identification of a factor relevant to the assessment of a knowing and intelligent waiver of a constitutional right to establish the factor as a prerequisite to a valid waiver.").

*Tovar* does not compel a different conclusion. In *Tovar*, the Court analyzed the Iowa Supreme Court's holding that, in order to satisfy the Sixth Amendment, a trial court, prior to allowing a defendant to plead guilty without the assistance of counsel, must provide a defendant with two specific warnings about the pitfalls of doing so. The Court held that no such specific warnings were required. The Court then, again in dicta, went on to discuss its previous Sixth Amendment waiver jurisprudence. It stated that "we have said that before a defendant may be allowed to proceed *pro se*, he must be warned specifically of the hazards ahead." *Tovar*, 541 U.S. at 88. The court further stated that, "Warnings of the pitfalls of proceeding to trial without counsel . . . must be rigorous[ly] conveyed." *Id.* (citing *Patterson v. Illinois*, 487 U.S. 285, 298 (1988)).[21] The Court also said, however, that "the information a defendant must possess . . . will depend on a range of case-specific factors," and that a waiver generally is sufficient if "a defendant fully understands the nature of the right and how it would apply in *general*

---

[21]     It is worth noting that *Patterson* was decided prior to *Dallio*.

circumstances—even though the defendant may not know the *specific* consequences of invoking it." *Tovar*, 541 U.S. at 88, 92 (emphasis in the original).  And finally, *Tovar* referred to *Faretta* only as "instructive," and suggested that the warnings described in *Faretta* could be used "so that the record will establish that [a *pro se* defendant] knows what he is doing" and his "choice is made with eyes open." *Id.* at 88–89.  Therefore, neither *Faretta* nor *Tovar* clearly establish, for purposes of AEDPA, that a state court must warn a defendant regarding self-representation, much less that it must do so in any particular way or using any specific formula.[22]  *See also United States v. Johnson*, 534 F.3d 690, 694 (7th Cir. 2008) (holding that the trial court's failure to inform a defendant of the disadvantages of proceeding *pro se* was "not fatal, for the ultimate question is not what was said or not said to the defendant but rather whether he in fact made a knowing and informed waiver of counsel").  The question, therefore, is whether the Appellate Division unreasonably applied *Johnson v. Zerbst* when it rejected petitioner's claim that his pre-trial waiver was not knowing, voluntary, and intelligent.  I find that it did not.

When Knight advised the trial court that he wished to proceed *pro se*, the court found that Knight was intelligent, and specifically that "he underst[ood] court procedures and rules of the court." Tr. at 184.  Knight filed a number of technical *pro se* motions, referred to certain legal doctrines by their shorthand names, *see* Tr. at 193 ("There's a lot of contradictory documentary proof in the *Rosario* papers that I have gotten . . . ."), and made legal arguments that demonstrated an understanding of the issues he was facing.  The court also understood that

---

[22]   In addition, the court in *Faretta* stated that defendants "*should* be made aware of the dangers and disadvantages of self representation . . . ." *Faretta*, 422 U.S. at 835 (emphasis added).  As the Second Circuit pointed out in *Dallio*, the Court's use of the word "should," as opposed to "shall," "cautions against interpreting [*Faretta*] as clear establishment of a legal mandate." *Dallio*, 343 F.3d at 563–64 ("Precisely because the word 'should' is legally variable, we cannot infer from its use in *Faretta* the Supreme Court's recognition of a clearly established prerequisite for a waiver of counsel." (citations omitted)).

Knight had previously worked at Legal Aid, *see* Tr. at 85, and that he had a lengthy criminal history that would have exposed him both to the criminal justice system and to the advantages of counsel. *See Zerbst*, 304 U.S. at 464 (stating that a trial court must evaluate the "background, experience, and conduct of the accused"). Moreover, the charges against Knight, and the evidence to be presented at trial, were straightforward and not complex in nature. *See Tovar*, 541 U.S. at 88 (stating that the "complex or easily grasped nature of the charge" informs the waiver analysis).

And, even if Supreme Court precedent clearly established that the "dangers and disadvantages" of proceeding *pro se* must be conveyed to a defendant prior to allowing him to proceed without counsel, I would not find that the Appellate Division acted unreasonably in determining that Knight validly waived his right to counsel. It is beyond dispute that the Supreme Court has never required any "rigid and detailed admonishment" or "litany" of specific warnings that must be conveyed to a defendant wishing to proceed *pro se*. *See Tovar*, 541 U.S. at 91; *Lopez v. Thompson*, 202 F.3d 1110, 1119 (9th Cir. 2000) ("Although *Faretta* announced a constitutional right to self-representation, it mandated no specific litany or formula to ensure that waivers of counsel are knowing and intelligent."). Here, the trial court conveyed to petitioner certain disadvantages and asked Knight to consider his decision very carefully. The court suggested that members of the jury could get "turned off," "mad" or "bored" by certain questions Knight would ask, that a lawyer could provide "insulation" between Knight and the jury, and that Knight could "put [his] foot in [his] mouth." Tr. at 184–89. The court told Knight that it was trying to "point out the pitfalls" and suggested that Knight "should go through [the decision to represent himself] very carefully in [his] mind." Tr. at 188. Finally, after the court instructed Knight that it would allow Birkett to stay on as standby counsel, the court instructed Knight that

29

"there are legal issues you may not be aware of . . . ."  Tr. at 190.  After being informed of these

issues, Knight explained to the court that the decision to represent himself was "not an overnight

decision" and that he had "been contemplating [it] since the opening of the case."  Knight also

explained to the court that he was determined to proceed *pro se* because he felt that Birkett was

"not zealously into the case like he should [be]."  Tr. at 192.  Only then did the court allowed

petitioner to waive his Sixth Amendment right to counsel.  Although the warnings provided to

petitioner may not have conveyed all the information circuit courts have required of district

courts in federal cases, or to which petitioner believes he was entitled, that is not the inquiry for a

federal habeas court reviewing a state court's decision.

I therefore find that the Appellate Division did not act unreasonably in determining that

petitioner validly waived his right to counsel in the first trial.[23]

---

[23]    I also reject petitioner's alternative arguments, that petitioner's waiver was not knowing
and voluntary because Birkett and the court "encouraged" petitioner to proceed *pro se*, and
because Birkett falsely stated that petitioner could not "pick and choose" between proceeding
*pro se* and proceeding with counsel.  With regard to the former, it was the court's job, under
*Faretta*, to determine whether petitioner was competent to proceed without counsel.  Obtaining
current counsel's opinion is an important part of the inquiry.  Nothing the court or Birkett said
prevented petitioner from making an intelligent decision, and petitioner points to no clearly
established Supreme Court precedent that dictates that a counsel waiver is invalid if a judge
and/or attorney suggests to a defendant that he is competent to conduct his own case.  Likewise,
Birkett's statement that petitioner could not "pick and choose" did not render petitioner's waiver
unknowing or involuntary.  Even assuming Birkett's statement was incorrect as a matter of law,
there is no evidence that petitioner relied on this statement in determining to proceed *pro se*.
Indeed, petitioner informed the court that he had been carefully considering proceeding *pro se*
since the outset of the trial, long before Birkett's statement.  Finally, petitioner did in fact pick
and choose between *pro se* status and representation by counsel.  Petitioner utilized Birkett's
representation for a number of tasks throughout trial.  These arguments are therefore without
merit.

### 2. Birkett's lack of preparation to proceed to trial

Knight also argues that his decision to proceed *pro se* was involuntary because he was forced to choose between self-representation and non-existent representation, as a result of Birkett's unpreparedness.

Petitioner's primary argument regarding Birkett's unpreparedness appears to be that Birkett failed to meet with petitioner sufficiently and did not appear for certain pre-trial status conferences. As an initial matter, Supreme Court precedent clearly establishes that the Sixth Amendment does not guarantee a "meaningful relationship between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Rather, the Sixth Amendment requires only "meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). Therefore, absent "some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is not implicated."[24] *Id.* at 658.

Petitioner has not shown any prejudicial effect of Birkett's alleged unpreparedness. Petitioner has identified no strategy unpursued, no evidence uncovered, no proverbial stone unturned. The closest petitioner comes to identifying such prejudice is his allegation that, immediately prior to his decision to proceed *pro se* at the suppression hearing, a "subpoenaed witness was lost" because of Birkett's absence from the hearing on the previous day. Pet'r's

---

[24]    There are circumstances in which the denial of counsel is so substantial that prejudice is presumed. For instance, prejudice is presumed if counsel is "totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 658 n.25. Prejudice is also presumed when, although counsel is available to assist the accused during trial, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate . . . ." *Id.* "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 668 n.26. Here, petitioner has alleged no such circumstances.

Mem. of Law (05-CV-2758) at 25.[25]   The record, however, reflects that the court informed petitioner that, should the unavailable witness become available, and should petitioner proffer a relevant basis for his testimony, the court would reopen the suppression hearing, even after the trial had begun. Tr. at 180–83, 91, 93, 97–98.[26]   Therefore, petitioner has failed to identify any prejudice from Birkett's alleged unpreparedness. *See Patterson v. State of New York*, 2010 U.S. Dist. LEXIS 35278 (E.D.N.Y. Apr. 9, 2010) (denying the petitioner's ineffective assistance of counsel claim, based on counsel's failure to consult with him adequately, when the petitioner failed to "indicate what additional meetings between himself and trial counsel would have uncovered in the way of evidence, alibi witnesses, or contradictory testimony that would have altered the result of the proceedings").

There is, however, a more fundamental factual problem with petitioner's Sixth Amendment claim.   A necessary predicate to a claim that a defendant was *forced* by the trial court to go to trial either *pro se* or with an unprepared attorney is the defendant's request for (and the trial court's denial of) a continuance or the appointment of new counsel. *See Pazden v. Maurer*, 424 F.3d 303 (3d Cir. 2005) (Sixth Amendment violated when trial court denied defendant's request for a continuance in the face of voluminous discovery); *Gilbert v. Lockhart*, 930 F.2d 1356 (8th Cir. 1991) (same).   Here, petitioner requested neither.   Indeed, the record reflects that, prior to the suppression hearing, the court asked petitioner if he wished to replace

---

[25]    Petitioner also takes issue with the scope of certain of Birkett's questions at the suppression hearing, alleging that he asked only questions suggested to him by Knight. Pet'r's Mem. of Law (05-CV-2758) at 22.  As discussed above, the court informed Knight that it would not have allowed Birkett to have expand the scope of the questioning beyond those he asked.  Tr. at 85.  Although petitioner asks us to infer that the purpose of this statement was "obviously to cover for Birkett, whom [the court] had hand-picked," this court will infer no such deceptive intent on behalf of the trial court.

[26]    Indeed, the witness in question, petitioner's former Legal Aid counsel, Robert Newman, did in fact ultimately testify at the hearing. *See* Tr. at 218.

Birkett, and petitioner did not respond.  *See* 4/25/95 Calendar Call Tr. at 4.  Therefore, petitioner

was not forced to do anything.  He voluntarily chose to proceed *pro se*.

I therefore find that the Appellate Division did not act unreasonably in determining that

petitioner's Sixth Amendment claims were without merit.

### C.   Petitioner's Sixth Amendment Claim That He Was Forced to Choose Between Incompetent Counsel and Proceeding *Pro Se* in the Second Trial

Petitioner claims that he was forced to choose between unprepared counsel or *pro se*

representation in his second trial as well.  Petitioner claims that Birkett was unprepared to

proceed to trial, that the trial judge would not grant a continuance or new counsel, and that

petitioner's Sixth Amendment rights were therefore violated.

As discussed above, prior to allowing a defendant to proceed *pro se*, a trial court must

determine that the defendant's choice is knowing, voluntary, and intelligent.  *Zerbst*, 304 U.S. at

464.  Moreover, to be voluntary, a court must determine that the choice to proceed without

counsel is an "exercise of free will."[27]  *Faretta*, 422 U.S. at 835.  To be an exercise of free will, a

defendant's waiver must have been the "product of a free and meaningful choice."  *Mckee v.

Harris*, 649 F.2d 927, 931 (2d Cir. 1981) (citing *Moore v. Michigan*, 355 U.S. 155 (1957)).  This

does not mean that a trial court may not force a defendant to choose between proceeding *pro se*

or with his current counsel, as long as that choice is not "constitutionally offensive."  *Id.* (citing

*Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976)).  Compelling a defendant to proceed

with incompetent counsel would present such a constitutionally offensive choice.  *See United

States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997).  Therefore, the resolution of petitioner's claim

hinges on whether there was evidence before the trial court to establish that Birkett's preparation

---

[27]   It is important to note that, unlike the first trial, petitioner does not here assert that his choice was unknowing or unintelligent, as it is undisputed that the trial court's warnings were sufficient to apprise petitioner of his rights.

33

was so deficient that requiring petitioner to proceed *pro se* or with Birkett as his counsel placed him in a "dilemma of constitutional magnitude."[28]  *Id.*

Petitioner's primary support for his argument is the undisputed fact that, between the time petitioner was sentenced in his first trial, on October 31, 1995, and the first conference of the second trial, on Thursday, November 30, 1995, Birkett had not had the opportunity to confer with petitioner.  The record reflects that Birkett informed the court that he and petitioner had "not had a significant opportunity to go over [the charges involved in the second trial]."  Tr. at 15.[29]  Petitioner then informed the court that he and Birkett had not spoken and that he believed Birkett was prioritizing other cases ahead of his own.  Petitioner also points to the denial of his request for a continuance until "some day next week,"[30] Tr. at 8–9, and the denial of his request for new counsel. None of these facts, however, warrant the conclusion that petitioner was faced with the choice of proceeding *pro se* or with incompetent counsel.

First and foremost, on November 30, petitioner's case was more than a year old.  And the record reflects that petitioner was provided with nearly the entire discovery file for *both* trials prior to the beginning of the first trial in September.  *See* Tr. at 6, 8.  The only discovery not yet provided to petitioner was certain *Rosario* material, *see* Tr. at 30, which, under New York law, is not required to be disclosed until "[a]fter the jury has been sworn and before the prosecutor's

---

[28]    The State claims that, because petitioner informed the court that he wished to "maintain [his] right to proceed *pro se*" in the second trial, Birkett was not obligated to be prepared. However, if, after being informed of his Sixth Amendment rights, petitioner indicated a desire for counsel, he had a Sixth Amendment right to competent counsel.  And only if Birkett constituted competent counsel could petitioner's choice to proceed *pro se* be considered voluntary.

[29]    Unless otherwise noted, all subsequent transcript references refer to the second trial, for which pre-trial conferences began on November 30, 1995.

[30]    Birkett later asked for a continuance "until Monday."  Tr. at 10.

opening address."[31]   N.Y. Crim. Proc. Law § 240.45.   Indeed, because the *Wade* and *Mapp/Dunaway* hearings, held prior to the first trial, included the issues involved in both cases, both petitioner and Birkett were familiar, at that time, with the facts and circumstances surrounding the second trial.  Therefore, that Birkett and petitioner had not had the opportunity to confer in the intervening period between his sentencing in the first trial, and the beginning of the second, does not, by itself, show that petitioner was placed in a "dilemma of constitutional magnitude."

Second, at the pre-trial conference, with regard to a continuance, petitioner himself requested only that the case be continued until "some day next week . . . just as long as I have a chance to consult with counsel, have the investigator go out [to the crime scene]."  Tr. at 9.  Birkett requested only that the court continue the case until the following Monday.  Tr. at 10.  But the record reflects that, despite the court's denial of petitioner's and Birkett's requests, petitioner, practically speaking, was provided with the time he requested.   The pre-trial conference occurred on November 30, a Thursday.  The pre-trial proceedings, including a new (but identical) *Sandoval* hearing, lasted the entire day of November 30.  Because petitioner is an observant Muslim, the court did not convene on Friday.  Tr. at 61–62.  Voir dire (which Birkett conducted) took the entire day on Monday, and therefore the trial itself did not start until Tuesday, December 5.  As the trial court correctly observed, this time provided petitioner with "enough time to listen to the [911] tape and whatever else [he] need[ed] to do."   Indeed, petitioner points to no investigation or strategy that could not have been pursued in this interim. *See Avery v. Alabama*, 308 U.S. 444, 452 (1940) (denying a Sixth Amendment claim for failure

---

[31]     Petitioner also informed the court that there was a 911 recording that he had not yet had a chance to listen to.  The record reflects, however, that the trial court allowed him to listen to the tapes prior to trial.  Tr. at 9, 63.

to grant a continuance when, despite having had only three days to prepare a capital murder case, the defendant's attorneys did not demonstrate "that they could have done more had additional time been granted"); *Marrant v. Cuomo*, 447 Fed. Appx. 234, 235–36 (2d Cir. 2011) (stating that, in evaluating a trial court's decision to deny a continuance, the Supreme Court requires courts to consider "the degree to which the denial of the continuance ultimately prejudiced the defendant"); *see also Morris*, 461 U.S. at 11–12 ("[O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel." (citations and quotations omitted)).

Finally, it is important to note that petitioner's case was straightforward, not complex in nature, and involved only a small handful of witnesses and evidence. Thus, petitioner's case is far from that of the defendant in *Pazdan v. Maurer*, 424 F.3d 303 (3d Cir. 2005), cited by petitioner, in which the court found that the defendant was unconstitutionally forced to choose between incompetent counsel and proceeding *pro se*. In *Pazdan*, the defendant faced a 131-count indictment. A month prior to trial (and two months after her appointment), defense counsel requested a continuance, alerting the court that the defendant had provided a potential witness list of 560 witnesses, that counsel expected to call at least 50 to 150 witnesses, that the prosecution had provided over 5,000 pages of discovery, and that there were a number of discovery requests still outstanding. In light of all of these facts, counsel requested a continuance, which the trial court denied. Because the defendant felt, at that point, he knew the case better than counsel, he elected to go *pro se*. After identifying *Zerbst* as the clearly established Supreme Court precedent, the Third Circuit found that the defendant's waiver could not be considered voluntary. The court found that the "prosecution's refusal to furnish timely discovery, the prosecution's furnishing of discovery in a piecemeal fashion, and defense

counsel's inability to interview all of the witnesses on the witness list before the trial was to begin," *Pazdan*, 424 F.3d at 316 n.15, in addition to counsel's repeated statements that she could not adequately prepare for trial, required reversal of the defendant's conviction.

Here, there is no allegation that the prosecution failed to timely disclose discovery in the second case. Indeed, nearly the entire discovery file was provided prior to the initiation of the first case. In addition, the evidentiary portion of petitioner's case consisted of only two days of testimony, and included only four witnesses, two of whom were used by the defense solely to rebut certain discrete statements made by the complaining witness. Therefore, the time provided to petitioner, whether measured from the indictment until his second trial, or even from November 30 until December 5, was sufficient to prepare for his case. *See Cronic*, 466 U.S. at 664 (reversing the Tenth Circuit's finding of constitutionally inadequate preparation time, and stating that the "significance of counsel's preparation time is further reduced by the [simple] nature of the charges against respondent").

In sum, petitioner asks this court to reject the Appellate Division's determination simply because he and Birkett did not confer between his sentencing in the first trial and the beginning of the second. He points to no prejudice from this asserted lack of time to prepare. And this is not a situation where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659. It was therefore not unreasonable for the Appellate Division to conclude, under the facts of this case, that November 30 to December 5 was a constitutionally adequate time for petitioner and counsel to complete preparation of his case.

Petitioner's Sixth Amendment claim, that he was forced choose between incompetent counsel and proceeding *pro se*, is therefore denied.[32]

### D.    Petitioner's Claim That Appellate Counsel Was Ineffective

Knight also claims that his appellate counsel, Donna Delahanty Walsh, Esq., was deficient. He first claims that her representation was so lacking that he was constructively denied the assistance of counsel altogether, and therefore he need not demonstrate that her representation prejudiced him in any way. Alternatively, petitioner claims that, even if he was not constructively denied counsel, Walsh's representation was ineffective under the standard set forth in *Strickland*. Both claims are without merit.

Petitioner's constructive denial claim is easily resolved. As discussed above, a defendant's claim that he was denied the effective assistance of counsel ordinarily is evaluated under the *Strickland* standard, which requires a showing of prejudice. *Strickland*, 466 U.S. at 688. The *Strickland* court noted, however, that there are certain errors that will support a *per se* presumption of prejudice because it is "so likely that case-by-case inquiry into prejudice is not worth the cost" in that the errors are "easy to identify" and are "easy for the government to prevent." In other words, the "actual or constructive denial of the assistance of counsel altogether," whether at the trial level or in a first appeal as of right, is *per se* constitutional error. *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (quoting *Strickland v. Washington*, 466 U.S. 668, 692,

---

[32]    To the extent that Knight's petition can be read to allege a Sixth Amendment violation on the basis of the trial court's failure to appoint new counsel, for the reasons stated above, petitioner's claim is denied. *See United States v. Hsu*, 669 F.3d 112, 122–23 (2d Cir. 2012) (stating that a trial court's decision not to appoint new counsel is reviewed for abuse of discretion and a reviewing court should consider "(1) whether the defendant's motion for new counsel was timely; (2) whether the district court adequately inquired into the matter;  (3) whether the conflict between defendant and attorney was so great that it resulted in a total lack of communication preventing an adequate defense; and (4) whether the defendant substantially and unjustifiably contributed to the breakdown in communication").

80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)).   Constructive denials of counsel include counsel's

total or near-total dereliction in representation. *See*, *e.g.*, *Jenkins v. Coombe*, 821 F.2d 158, 161

(2d Cir. 1987) (filing cursory five-page brief on appeal); *Tippins v. Walker*, 77 F.3d 682, 686 (2d

Cir. 1996) (sleeping through trial); *Castellanos v. United States*, 26 F.3d 717, 720 (7th Cir. 1994)

(failing to honor defendant's instruction to file a notice of appeal).   *But see Morales v. United*

*States*, 143 F.3d 94 (2d Cir. 1998) (declining to apply a *per se* rule of prejudice when attorney

failed to file appellate brief, because defendant did not ask him to do so, and was advised

previously of his right).

     Courts have been "reluctant to extend a rule of *per se* prejudice in any new direction," *see*

*Morales*, 143 F.3d at 97, and the court declines to do so here.   Petitioner's primary complaint

with regard to constructive denial is, as with each of his two previous lawyers, that Walsh failed

to communicate with him as often as he deemed sufficient.   He acknowledges, however, that

Walsh did communicate with him on more than one occasion.[33]   He also argues that Walsh did

not adequately review his record and pressed unsuccessful claims in the face of others that were

likely to succeed.   But Walsh did not abandon him, and in fact filed a 30-page appellate brief on

his behalf.   Moreover, the factual allegations made here are "perfectly amenable to analysis

under the *Strickland* prejudice test."   *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996).

Therefore, petitioner's claim that he was constructively denied appellate counsel is rejected.   *See*

*also Cronic*, 466 U.S. at 668 n.26 ("Apart from circumstances of [substantial] magnitude . . .

there is generally no basis for finding a Sixth Amendment violation unless the accused can show

---

[33]    As discussed above in footnote 36, courts have held that the "brevity of consultation time
between a defendant and his counsel alone cannot support a claim of ineffective assistance of
counsel." *See Raposo v. United States*, 2004 U.S. Dist. LEXIS 8081, 2004 WL 1043075, at *12
(S.D.N.Y. May 7, 2004) (quoting *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).   There is
no required minimum number of meetings between counsel and client.   *See United States ex rel.*
*Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir. 1986).

how specific errors of counsel undermined the reliability of the finding of guilt."); *Smith v. Robins*, 528 U.S. 259, 285 (2000) (declining to apply a presumption of prejudice to a defendant's claim that his appellate counsel was ineffective when he determined that there were no meritorious claims to pursue).

In the alternative, petitioner claims that Walsh was ineffective under the "demanding standard set forth in *Strickland*." *Morales*, 143 F.3d at 96. Petitioner recites a laundry list of complaints, including that Walsh failed to communicate with him adequately, that she did not send to him a copy of the State's appellate brief, that she did not file a reply brief or orally argue the case, that she did not send him a copy of the final decision, and that the arguments that Walsh pressed in the Appellate Division were far weaker than others, which petitioner alleges would have been successful. Walsh, in an affidavit submitted to this court, disputes several of these allegations and characterizations. But it is unnecessary to determine whether Walsh's performance was deficient under the first prong of *Strickland*, because the record reflects that petitioner cannot establish that Walsh's conduct resulted in any prejudice to the outcome of his appeal.

As with a claim of ineffective assistance of trial counsel, a petitioner claiming ineffective assistance of appellate counsel must demonstrate prejudice under *Strickland*. *Robins*, 528 U.S. at 285. In the context of an appeal, this means that petitioner must show that, but for his attorney's deficient performance, there is a reasonable probability that he would have prevailed on his appeal. *Id.* Here, petitioner attempts to satisfy this burden by pointing to two claims that he argues would have been successful in the Appellate Division: his claim that he was advised inadequately of his Sixth Amendment rights in the first trial, and his claim that in his second trial he was forced to choose between incompetent counsel and proceeding *pro se*.

40

But petitioner's argument suffers from one fatal flaw—he raised each of these arguments in detail in his *pro se* supplemental brief, and the Appellate Division specifically determined that "the defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit." *Knight*, 1 A.D.3d at 380.  When a petitioner has raised, in a supplemental *pro se* brief, the very issues that he asserts demonstrate prejudice, his ineffective assistance of appellate counsel claim must be denied. *See Moreau v. Ercole*, 2011 U.S. Dist. LEXIS 48277, at *30 (E.D.N.Y. May 5, 2011) ("[P]etitioner cannot show prejudice from his appellate counsel's failure to raise other issues" because "petitioner himself raised most of the other issues he now contends that his appellate counsel should have raised, and the Appellate Division rejected them."); *Joyner v. Ercole*, 2010 U.S. Dist. LEXIS 121604, at *28 (E.D.N.Y. Nov. 1, 2010) ("Petitioner was not prejudiced [by appellate counsel's failing to raise on appeal the claims that petitioner himself raised in his pro se supplemental brief because] petitioner's brief was filed with the Appellate Division's permission, and because it is clear that the Appellate Division did consider and reject the claims raised in that submission."); *Hightower v. Kelly*, 657 F. Supp. 516, 517–18 (S.D.N.Y. 1987) (finding that "petitioner failed to demonstrate prejudice because all of the arguments petitioner claims his counsel should have raised on appeal were actually raised, either by counsel or by petitioner himself in his *pro se* brief to the Appellate Division").

Petitioner invites this court to "assume that busy state intermediate appellate courts pay closer attention to lawyers' arguments than laypersons'".  Pet'r's Supplemental Mem. of Law (05-CV-2758) at 38.  But petitioner has presented no evidence to support such an assumption. On the contrary, "where there is no basis either in the history of the case or the opinion of the Appellate Division for believing that the claim at issue was denied on procedural or any other nonsubstantive grounds, a terse statement that remaining contentions are without merit suffices

41

to trigger AEDPA's heightened standard of review." *Dallio*, 343 F.3d at 560; *see also Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). It would be incongruous indeed to find that such a statement is sufficient to trigger AEDPA's substantial deference, but nevertheless leaves room for a federal court to assume that the Appellate Division gave inadequate consideration to petitioner's *pro se* arguments. Moreover, petitioner's assumption would require this court to presume that a unanimous panel of the Appellate Division failed to construe liberally Knight's *pro se* brief, and overlooked two meritorious issues that petitioner fairly (and thoroughly) presented to the panel in his *pro se* brief. That this court will not do.

Petitioner's claim that he was denied the effective assistance of appellate counsel is denied.

### E.     Petitioner's Claim That Counsel Was Ineffective for Failure to Advise Him Adequately of the Consequences of the State's Plea Offer

Finally, petitioner claims that the trial court, on his § 440 motion, erred when it found that he was not provided ineffective assistance of counsel when Horn and Birkett allegedly failed to correct his misunderstanding as to how petitioner's seven years of remaining parole would be incorporated into the State's plea offer of 8-years-to-life.

Prior to turning to the merits, I note that petitioner's plea-related claim arises in a motion to amend his original habeas petition. At the time of his original petition, Knight's § 440 motion was pending in state court.

A motion to amend a habeas petition is governed by Federal Rule of Civil Procedure 15 ("Rule 15"). *Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001). Under Rule 15, a party may amend once as of right within certain time frames, or upon consent of the opposing party or leave

of the court. Courts must "freely give" leave to amend where justice requires. Fed. R. Civ. P. 15(a)(2). This mandate appears especially appropriate in the context of a *pro se* filing—as Knight's petitions originally were. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Petitioner's motion for leave to amend is granted.

Supreme Court precedent clearly establishes that a defendant has the right to the effective assistance of counsel during the plea-bargaining process. *See Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, decided in 1985). An ineffective assistance of counsel claim in the plea context is, like all other ineffectiveness claims, governed by the standard set forth in *Strickland*. *See id.*; *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). In the context of a plea related ineffectiveness claim, this means that, in addition to establishing that his attorney provided deficient advice, a defendant, in order to establish prejudice, "must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. In petitioner's case, this means that he must show that, "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)," and that the court would have accepted it. *Id.* at 1385.

Petitioner contends that his attorneys' performance was deficient because they failed to correct his erroneous assumption that the seven years that remained on his parole term would be added to the minimum portion of the State's eight-years-to-life offer. In response to this allegation (and in connection with petitioner's § 440 motion), Horn submitted an affidavit in which he stated that he had dealt with this precise issue many times prior to representing petitioner, affirmed that not only he, but "multiple attorneys" from Legal Aid, advised petitioner

of the correct calculation, and stated that he was "confident Mr. Knight was correctly advised about how the parole violation would affect his sentence." The § 440 court found Horn's affidavit "credible" and stated that the "likelihood of successive counsel failing in an identical manner about the same routine matter is extremely low." This factual finding alone supports dismissal of petitioner's claim, as he has not shown that this was an unreasonable determination of the facts or produced "clear and convincing evidence" that this finding was incorrect. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1); *see also Zhang v. United States*, 506 F.3d 162, 164 (2d Cir. 2007) (dismissing defendant's claim that his guilty plea was involuntary because he was unaware of the deportation consequences, where the judge at the plea allocution told the defendant that his conviction could result in deportation).[34]

Even assuming that petitioner's counsel was deficient, however, he cannot establish a reasonable probability that, had he received competent advice, he would have accepted the prosecution's offer. In an attempt to establish prejudice, petitioner stated, in an affidavit submitted in connection with his § 440 motion, that "there was a very strong probability that defendant could have been persuaded to accept the offer the same way the Legal Aid attorney

---

[34]     The § 440 court went on to analyze petitioner's claim, assuming his allegations regarding the plea advice to be true. The court provided two additional, independent reasons that his claims were rejected. One of these reasons was that "the mere failure to advise defendant of the potential collateral consequences of his guilty plea, without more, does not constitute ineffective assistance of counsel. If . . . counsel affirmatively misinformed him or misled a defendant about the collateral consequences, such advise . . . would be deficient." *Knight*, 831 N.Y.S.2d at 349. After *Padilla*, *Lafler*, and *Frye*, it is highly likely that this holding would be an unreasonable application of clearly established Supreme Court precedent. Although those cases deal with affirmative misinformation, as opposed to a failure to correct a misunderstanding, they clearly dispense with the collateral/direct consequences distinction. I need not decide this issue, as the court went on to find, alternatively, that petitioner could not establish prejudice, and this court can uphold the state court's decision on that basis. *See Parker v. Matthews*, 132 S. Ct. 2148 (2012) (stating that it was "irrelevant that the [Kentucky Supreme Court] invoked a ground of questionable validity" if the decision was sustainable on an alternate ground).

was able to convince him not to testify at the grand jury after arguing with defendant for at least 15 minutes." After reviewing petitioner's affidavit, and the surrounding circumstances, the § 440 court concluded that petitioner had not established a reasonable probability that, but for the deficiencies of counsel he would have insisted on pleading guilty.

Although the state court's prejudice finding is a finding of fact, *see Cullen v. United States*, 193 F.3d 401, 405 (2d Cir. 1999), it is unclear whether this finding is entitled to a presumption of factual correctness that must be rebutted by clear and convincing evidence, as dictated by 28 U.S.C. § 2254(e)(1), or the potentially less deferential "unreasonable determination of the facts" deference of § 2254(d)(2).[35] Under either of these standards, however, the state court did not unreasonably reject petitioner's claim. Petitioner's affidavit equivocally states that he could have been persuaded to plead guilty if his attorney was willing to

---

[35]     Neither the Supreme Court nor the Second Circuit has yet provided guidance on the interaction between the factual reasonableness inquiry dictated by § 2254(d)(2) and the clear and convincing evidence standard of § 2254(e)(1). Some commentators have suggested that the two subsections should be read together as prescribing a two-step inquiry: first, a court determines the (substantive or procedural) reasonableness of the state court's determination only on the record before the state court; and second, if the determination is deemed reasonable, into whether the petitioner has presented the habeas court with evidence (including evidence not in the state court record) that establishes by clear and convincing evidence that the factual determination is erroneous. *See* 1 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure*, § 20.2c, at 751–52. Some courts have suggested that habeas petitioners must meet *both* the standard of § 2254(d)(2) and that of § 2254(e)(1). *See, e.g.*, *Jackson v. Anderson,* 112 F.3d 823, 824–25 (5th Cir. 1997) (stating that a habeas petitioner must meet both standards). Other courts have suggested that § 2254(e)(1) applies to "determinations of factual issues, rather than decisions," while § 2254(d)(2) "applies to the granting of habeas relief" itself. *Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) (citing *Miller-El* v. *Cockrell*, 537 U.S. 322, 341–42 (2003)). The only indication the Second Circuit has provided is to say that it has not decided whether a habeas petitioner "must prevail under *both* § 2254(d)(2) and § 2254(e)(1)." *Green v. Travis*, 414 F.3d 288, 299 n.6 (2d Cir. 2005) (emphasis added). As discussed above, the court need not resolve the issue, as petitioner's claim is inadequate under any of these standards.

argue with him.  The state court correctly observed that this sort of statement shows "no resolute intention to plead guilty."

In arguing that he has established prejudice, petitioner points to the dramatic difference in the minimum sentence offered (8 years) and the minimum sentence petitioner received (50 years).  *See Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (holding that a petitioner's statement that he would have accepted a properly advised plea "must be accompanied by some objective evidence, such as a significant sentencing disparity, that supports an inference that the petitioner would have accepted the proposed plea offer if properly advised").  But comparing the minimum sentence he was offered to the minimum sentence he received vastly overstates the effect of petitioner's alleged misapprehension.  Even under petitioner's alleged misapprehension, he was facing only a 15-year minimum sentence.  And petitioner does not suggest that he was unaware that, should he go to trial in both cases, he was facing a possible minimum of 50 years.  Therefore, even under petitioner's alleged misapprehension, there existed a 35-year disparity between the State's offer and the possible minimum he faced if he went to trial—a disparity he accepted.  If properly advised by counsel, the disparity would have increased only by seven years, from 35 to 42 years.

This is therefore not a set of circumstances like that which the Second Circuit found significant in *United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998), or in *Mask v. McGinnis*, 233 F.3d 132 (2d Cir. 2000).  In *Gordon*, the defendant's counsel erroneously advised him that, if he went to trial, he would be exposed to 120 months in prison.  On that basis, he rejected a plea offer that would have subjected him only to 84 months.  After being found guilty at trial, it was revealed that the defendant was in fact exposed to 327 months in prison.  In his habeas petition, the defendant relied on a self-serving (yet unequivocal) affidavit that he would have pled guilty

46

had he been adequately advised.  The government argued that such a self-serving affidavit was insufficient to establish prejudice.  In finding prejudice established, the Court found that "the fact that there is a great disparity between the actual maximum sentencing exposure under the Sentencing Guidelines and the sentence exposure represented by defendant's attorney provides sufficient objective evidence [when combined with a petitioner's statement concerning his intentions] to establish a reasonable probability that the outcome of the proceedings would differ."  *Gordon*, 156 F.3d at 381.

Likewise, in *Mask*, the defendant's attorney erroneously advised him that he was a persistent violent felony offender and that the prosecution's offer of 10 years to life was the best offer the State could make.[36]  The defendant rejected the offer and, after being convicted, was sentenced to 20 to 40 years in prison.  After his conviction, it was revealed that petitioner was not in fact a persistent violent felon and that therefore he would have been eligible for a lower plea offer.  In his habeas petition, the defendant submitted an equivocal affidavit which stated that he would have "been willing to consider pleading guilty if the prosecution had offered a guilty plea of less than 10 years to life.  I rejected the 10 to life plea offer because it was unreasonable. . . . A plea offer that I would have considered to be reasonable would have been 8 to 16 years."  However, it was also revealed that the part of the sentence that the defendant was troubled by was the life maximum.  According to the defendant, there was no good behavior credit for life sentence maximums.  In addition, the defendant's counsel represented to the court that, subsequent to the defendant filing a habeas petition, he had spoken with the original prosecutor on the case, who informed him that, had she known that the defendant was not subject to the persistent violent felony offender minimum, she would have offered 6 to 12 years.  In

---

[36]     The State labored under the same misunderstanding of the law.

contesting the defendant's motion, the State argued that his affidavit was insufficient to establish prejudice. In rejecting this argument, the Court, while acknowledging that the affidavit was equivocal, found it significant that there was a "large disparity between defendant's sentence exposure following trial and his potential exposure had a plea offer been made on the basis of accurate information." *Mask*, 233 F.3d at 142. The court also found it significant that the defendant (implicitly) would have considered the State's revised plea offer to be reasonable. The court therefore upheld the district court's grant of habeas corpus.

Petitioner's circumstances are materially different from those in both *Gordon* and *Mask*. First, petitioner was *exposed* to the exact same potential sentence in both the plea offer and at trial: a life sentence. Second, the erroneous belief under which petitioner labored was greatly different from that of the defendants in *Gordon* and *Mask*. In *Gordon*, defense counsel erroneously advised his client that he would be exposed to 120 months in prison; he was in fact exposed to 327 months. In *Mask*, defense counsel erroneously advised his client that the best plea offer he could be extended required a maximum term of life in prison; in fact, he could have been offered as low as a 12-year maximum. Petitioner's allegedly erroneous assumption, on the other hand, involved only seven years.

As discussed above, petitioner points to the disparity between the minimum offered by the State (without his seven years of parole) and the minimum to which he was actually sentenced. But, even under petitioner's alleged erroneous assumption, there existed a 35-year disparity between what the government offered and what he was facing should he go to trial. The only disparity that is relevant is the disparity that relates to the alleged erroneous assumption, which, in this case, is seven years. In other words, under his alleged misapprehension, petitioner chose to proceed to trial knowing that his exposure was to a 35-year

48

longer minimum than the State's offer provided for.  With the advice from counsel that he claims he was not given, this disparity would have increased to 42 years.  Given this relatively minor increase in disparity, in combination with the equivocal nature of petitioner's statement regarding his willingness to accept a plea, I find no reasonable probability that petitioner would have accepted the prosecution's offer.

Finally, I deny petitioner's request for an evidentiary hearing on his plea-related ineffectiveness claim.  "[I]n habeas cases, the district court is not limited to the state court record, and has discretion to conduct an evidentiary hearing."[37]  *Jones v. Vacco*, 126 F.3d 408, 417 n.2 (2d Cir. 1997).  Among the factors relevant to the district court's determination to hold a hearing are the existence of a factual dispute, the strength of the proffered evidence, the thoroughness of prior proceedings and the nature of the state court determination.  *Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir. 1993). "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (ellipsis in original; quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Here, none of the above considerations lead me to believe that an evidentiary hearing is required.   On the contrary, the factual record appears well developed.   For purposes of determining prejudice, the state court assumed that the State did in fact offer petitioner the asserted plea offer, that counsel's performance was deficient, and that petitioner labored under a misperception regarding the effect of his parole on the State's plea offer.  And the record clearly

---

[37]      I also note that § 2254(e)(2)(A)'s prohibition on evidentiary hearings does not apply because there is no allegation (and I do not find) that petitioner "failed to develop the factual basis of [his] claim."

reflects the disparity between the State's plea offer and the sentences that petitioner ultimately received.  Moreover, the court considered petitioner's affirmation that he "could have been persuaded to accept the offer" had Horn or Birkett been willing to argue with him about it.  It is unclear, therefore, what factual development or dispute petitioner believes exists.  Petitioner directs the court to no evidence that the state court may have overlooked, and he does not purport to produce any newly discovered evidence.  There is therefore no reason—especially in light of AEDPA's deferential standard—to believe that a further development of the facts would allow petitioner to demonstrate that he is entitled to relief.  Petitioner's request for an evidentiary hearing is therefore denied.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (stating that an evidentiary hearing is not required if the record otherwise precludes habeas relief); *Cf. Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (holding that, under 28 U.S.C. § 2255, which *requires* a hearing unless the submissions "conclusively show that the prisoner is entitled to no relief," the "district court reasonably decided that the testimony of [the defendant] and his trial counsel would add little or nothing to the written submissions [including affidavits]").]

In sum, the § 440 court's prejudice determination did not involve an unreasonable determination of the facts before it, *see* 28 U.S.C. § 2254(d)(2), and petitioner has presented no evidence which would, by clear and convincing evidence, overcome the presumption of correctness that attaches under 28 U.S.C. § 2254(e)(1).  In addition, to the extent that petitioner argues that, because it did not hold an evidentiary hearing, the state court's determination was procedurally unreasonable under § 2254(d)(2), his claim is rejected for the reasons stated above regarding this court's denial of an evidentiary hearing.[38]  *See Taylor v. Maddox*, 366 F.3d 992,

---

[38]      Although the Second Circuit has not discussed the issue, at least the Ninth and Tenth Circuits have held that, if the fact-finding process (as opposed to the decision) is unreasonable, § 2254(d)(2) deference is inapplicable.  *See Taylor*, 336 F.3d at 1000; *Wilson v. Workman*, 577

1000 (9th Cir. 2004) ("[B]efore we can determine that the state-court fact-finding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.").

Petitioner's plea-related ineffectiveness claim is therefore denied.

## CONCLUSION

For the reasons discussed above, petitioner's motion for leave to amend his habeas corpus petitions is GRANTED.  His petitions for writs of habeas corpus are DENIED.  Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  28 U.S.C. § 2253.

**SO ORDERED.**

/s/ Nina Gershon
_____
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
       November 28, 2012

---

F.3d 1284 (10th Cir. 2009).  *But see Valdez v. Cockrell*, 274 F.3d 941, 946–67 (5th Cir. 2001).